**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>JEREMIAS SANCHEZ-VELASCO,<br><br>　　　　Defendant. | No. 18-CR-54-LRR<br><br>**REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS** |

_____

TABLE OF CONTENTS

I.   Introduction……………………………………………………………………… 1
II.  Findings of Fact ………………………………………………………………… 2
III. Discussion………………………………………………………………………… 4
　A.  Whether Defendant Was in Custody ………………………………………… 5
　B.  Whether Miranda Was Required for Administrative Questioning ……………13
　C.  Whether the Inevitable Discovery Exception Applies………………………… 15
IV.  Conclusion………………………………………………………………………… 17

### *I.     INTRODUCTION*

This matter is before the Court on defendant's motion to suppress statements allegedly elicited in violation of the Fifth Amendment to the United States Constitution. (Doc. 10). The Government timely resisted the motion. (Doc. 12). A grand jury charged defendant with two counts of immigration-related offenses. Defendant seeks to suppress evidence stemming from contact with immigration officers on April 27, 2018, in Cedar Rapids, Iowa. Defendant contends that officers restricted his freedom to a degree that defendant was placed in custody and the Court should suppress statements defendant

1

made because the officers did not provide him with a *Miranda* warning.  Defendant also moves to suppress statements he later made while being booked into Immigration and Customs Enforcement (ICE) custody.

The Honorable Linda R. Reade, United States District Court Judge, referred the motion to me for a Report and Recommendation.  On July 23, 2018, I held an evidentiary hearing on the motion.  For the following reasons, I respectfully recommend that the Court **deny** defendant's motion.

## II. FINDINGS OF FACT

Immigration and Customs Enforcement Officer Bryce Callison testified that on April 27, 2018, defendant went to the Linn County Treasurer's Office to register his vehicle.  The office is located in a public building and this particular part of the building is a wide open area with a lot of clerk windows, a seating area, and many members of the public present.  Defendant ultimately approached one of the windows and spoke with a clerk, Brynn Love.

Defendant spoke primarily Spanish and the clerk spoke little Spanish, making communication difficult.  The clerk asked defendant for his "identificación," and defendant presented a Guatemalan identification card.  Defendant also presented her with documentation showing proof of car insurance.  The clerk could not locate defendant's name in the Iowa Department of Transportation ("IDOT") database, so the clerk requested defendant's social security number.  Defendant replied that he did not have it with him and that he had not memorized it.  Instead, the clerk looked up the vehicle identification number of defendant's vehicle, which showed defendant's wife as the primary owner and defendant as the secondary owner.  The clerk found a social security number used by defendant on the vehicle purchase records contained in the IDOT database.  Defendant's name as reflected in the IDOT database, however, did not match defendant's name as reflected on his insurance documentation.  When asked about this discrepancy, defendant replied that the name in the database was defendant's true name.

2

The clerk reported this inconsistency to her supervisor, who noticed that defendant's proof of insurance documentation, Guatemalan identification card, and application for title each listed a different address for defendant.

The supervisor directed the clerk to contact an IDOT investigator to resolve the inconsistency. The clerk called IDOT Investigator Jason Nesbaum and provided him with the information. While Investigator Nesbaum was conducting his investigation, but before he informed the clerk of the results of the investigation, defendant stated that he would leave and have his documentation fixed to reflect the correct information. The clerk requested that defendant wait because she was seeking approval to use the identification defendant provided, and that she would have an answer soon as to whether the identification was acceptable. The clerk had apparently learned that defendant also had a California state identification card, but when the clerk requested the card, defendant stated that he did not have it with him. Defendant then started to leave, but the clerk asked him to wait and assured defendant that it would not take much longer to obtain an answer as to whether the identification was acceptable. Defendant remained and initiated a conversation with the clerk about Mexican food, which included him telling her where he worked.

Meanwhile, Investigator Nesbaum input defendant's social security number into the IDOT database. Investigator Nesbaum then called the clerk and informed her that the social security number on file for defendant did not match defendant's name and that Investigator Nesbaum had alerted immigration authorities about defendant. He also stated that he intended to come to the Treasurer's Office to talk with defendant. Investigator Nesbaum asked the clerk to "stall" defendant until he arrived. Investigator Nesbaum also alerted the Cedar Rapids Police Department because Investigator Nesbaum was concerned that he may not arrive in time.

The clerk continued to encourage defendant to wait for the investigator. Two immigration Deportation Officers, Billy Walker and Bryce Callison, arrived at approximately 9:00 AM. They approached the clerk and defendant and asked to speak

with defendant. The immigration officers wore plain clothes, carried concealed weapons, and did not have visible badges or other indicia of authority. The immigration officers retrieved defendant's documents from the clerk[1] and asked if there was a place they could talk with defendant. The clerk's supervisor identified a nearby conference room and led the way. Office Walker requested that defendant accompany them to the conference room. Officer Walker indicated that he gestured to the conference room, said "please," and that he used a normal tone of voice. Defendant consented to accompany the immigration officers. Neither officer touched defendant. Nor did they identify themselves as immigration or law enforcement officers.

Once in the conference room, the door was shut. Upon questioning, defendant confirmed that the Guatemalan identification card belonged to him, that he was from Guatemala, and that he was in the United States without permission. At this point, at approximately 9:15 AM, the immigration officers placed defendant under arrest for immigration violations. Cedar Rapids police officers arrived at the Linn County building after Officer Walker placed defendant under arrest. The ICE officers then transported defendant to the local ICE office where he was processed. Officer Callison, a deportation officer and not a criminal investigator, asked defendant questions as part of an immigration administrative processing, which included questions soliciting biographical information from defendant.

### III. DISCUSSION

Defendant raises three issues in his motion to suppress. The first is whether defendant was in custody for the purposes of *Miranda* at the time he was questioned by ICE officers at the Treasurer's Office. (Doc. 10-1, at 4). The second is whether the questioning conducted by ICE officers amounted to an interrogation for the purposes of

---

[1] The clerk testified at the hearing that she had returned all of defendant's documents to him before the officers arrived, but Officer Walker testified that he believed he retrieved the documents from the clerk, although he stated his memory was "fuzzy" on that. For purposes of this analysis, I will assume the clerk had not returned defendant's documents to him.

*Miranda*. (*See id.*). Defendant contends that, if the Court answers both of these questions in the affirmative, then because defendant was never informed of his rights as required under *Miranda,* the Court should suppress the statements defendant made at the Treasurer's Office. (*Id.*, at 8). At the hearing, defendant further argued that the Court should also suppress any statements he made once he was in ICE custody.[2] The government argues that defendant was not in custody when he made the statements at the Treasurer's Office, and that *Miranda* warnings were not required before asking defendant routine booking questions at the ICE office. In the alternative, the government argues that it would have inevitably discovered the evidence against defendant even if there was a violation of defendant's constitutional rights. I will address each of these issues in turn.

### A. Whether Defendant Was in Custody at the Treasurer's Office

I begin with the question of whether defendant was in custody at the time he was questioned by ICE officers at the Treasurer's Office. The Fifth Amendment to the United States Constitution provides, inter alia, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. The protections provided to citizens by this amendment apply just as much to aliens present in the United States illegally as they do to United States citizens. *Martinez Carcamo v. Holder*, 713 F.3d 916, 921 (8th Cir. 2013). *See also Padilla v. Kentucky*, 559 U.S. 356, 374 (2010) ("It is [the Court's] responsibility under the Constitution to ensure that no criminal defendant—whether a citizen or not—is left to the mercies of incompetent counsel.") (citation and internal quotations omitted). When subject to a custodial interrogation, a

---

[2] It is worth noting that defendant does not identify exactly what statements he made either when he was first questioned or when he was later questioned while in ICE custody that he believes were incriminating on the current charges. Apparently, defendant's theory is that all statements should be suppressed, and without them the government cannot establish they ever had contact with defendant, which then must lead to the suppression of all evidence pertaining to defendant. This failure to identify specific statements defendant asserts are incriminating is particularly material to the inevitable discovery exception to the exclusionary rule discussed in Section C below.

suspect is entitled to be informed of his or her rights prior to answering any questions. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A court may use the exclusionary rule to preclude the government from using evidence obtained in violation of a defendant's constitutional rights. *Mapp v. Ohio*, 367 U.S. 643, 659-60 (1961).

For the purposes of *Miranda*, a custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Miranda*, 384 U.S. at 444. A custodial interrogation may be further understood as a situation in which "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). This standard is objective and is not dependent on the past experience of the suspect. *Yarborough v. Alvarado*, 541 U.S. 652, 668-69 (2004). In determining whether a defendant was in custody at the time of questioning, a court considers the totality of the circumstances. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). A court should consider the following factors when conducting its analysis:

1) Whether suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

2) Whether the suspect possessed unrestrained freedom of movement during questioning;

3) Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

4) Whether strong arm tactics or deceptive stratagems were employed during questioning;

5) Whether the atmosphere of the questioning was police dominated; or,

6) Whether the suspect was placed under arrest at the termination of questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). This is not an exhaustive list and courts should not rigidly or ritualistically apply them. *Czichray*, 378 F.3d at 827

("'[C]ustody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."). Ultimately, whether a suspect is in custody depends on whether "a reasonable person in [the suspect's] position would have felt free to terminate the interrogation and leave." *United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012).

In the context of *Miranda*, an "interrogation occurs as a result of either the government's (1) express questioning; or (2) its functional equivalent, i.e., words or actions 'that the police should know are reasonably likely to elicit an incriminating response. . . .'" *United States v. Arango-Chairez*, 875 F. Supp. 609, 616 (D. Neb. 1994), *aff'd*, 66 F.3d 330 (8th Cir. 1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-301)).

An immigration enforcement officer, without requiring a warrant, is authorized

1) To interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;
2) . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest. . . .

8 U.S.C. § 1357(a). The term "reason to believe" in § 1357(a) means probable cause as required by the Fourth Amendment. *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).

The indicia of custody established by *Griffin*, listened above, are a useful starting point in the Court's analysis in this case. The first three factors are said to be mitigating factors, the presence of which tend to indicate that a defendant was not in custody. *Griffin*, 922 F.2d at 1349. The last three factors are said to be coercive factors, the presence of which tend to indicate that defendant *was* in custody. (*Id.*). Not all factors need be present to reach a conclusion and a particularly strong presence of one factor may compensate for the absence or insufficiency of other factors. (*Id.*).

7

Case 1:18-cr-00054-LRR-MAR    Document 16    Filed 08/01/18    Page 7 of 17

### i. Advice Given by Officers

When officers inform a suspect that he is not formally under arrest and is free to leave, "custody has frequently been found not to exist." *Griffin*, 922 F.2d at 1349 (citing *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)). *See also United States v. Goudreau*, 854 F.2d 1097, 1098 (8th Cir. 1988) (finding of custody mitigated where suspects were informed that interview was voluntary). In this case, there is no evidence from the record that officers affirmatively told defendant that he was free to leave. To the contrary, Officer Walker testified that defendant was not free to leave once ICE officers arrived on scene. Neither Officer Walker nor Officer Callison, however, informed defendant of this fact. Thus, this factor does not contribute much to the analysis of whether a state of custody existed at the time of questioning, but will not serve to ameliorate any coercive factors.

### ii. Restraint

The second factor is whether defendant was restrained during questioning. "Circumstances of custody are often obviated where the suspect's freedom of action is not curtailed during questioning." *Griffin*, 922 F.2d at 1350. The objective presence or absence of physical restraints is not the only consideration, however. Rather, "the relevant inquiry is the effect on the suspect." *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (citing *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984)). Thus, being told to "stay put" or being under constant guard can amount to restraint just as being handcuffed or shackled can. *See Carter*, 844 F.2d at 372 (finding custody exists where suspect told to "just stay here"); *State of South Dakota v. Long*, 465 F.2d 65, 69-70 (8th Cir. 1972) (finding custody exists where suspect under continuous supervision).

In this case, Officer Walker testified that at no point did the officers physically compel, handcuff, or otherwise restrain or touch defendant. Testimony at hearing revealed that the officers did not touch defendant until defendant was formally arrested, after questioning. The door to the conference room was closed during questioning, but

a reasonable person in defendant's position would likely view that this was due to the noise of the crowded waiting room of the Treasury office rather than an attempt to restrict his freedom of movement. The closing of the door by itself would not suggest to a reasonable person in this setting that the officers were attempting to restrain his movement. No evidence has been offered to suggest that defendant understood himself to be under arrest. Thus, the second factor of the *Griffin* analysis weighs against a finding that defendant was in custody at the time of questioning.

### iii. Who Initiated Contact

A custodial interrogation requires "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. The Eighth Circuit has held that custody is more likely to exist when the contact between law enforcement officers and the suspect is initiated by the officers. *United States v. Mottl*, 946 F.2d 1366, 1369 (8th Cir. 1991). The Eight Circuit has also held that custody does not exist where law enforcement officers request to speak with a suspect and the suspect voluntarily complies. *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985).

In this case, the ICE officers initiated the contact with defendant. The officers did not immediately begin to question defendant, however. They requested that defendant accompany them to the conference room and defendant voluntarily complied. Officer Walker testified that if defendant had refused the request then the officers would have compelled him, but that did not happen. At the time that defendant made the conscious decision to accompany the officers into the conference room, however, defendant had no reason to believe that the choice was not fully his to make. Nevertheless, the third factor of the *Griffin* analysis weighs in favor of finding that defendant was in custody at the time of questioning.

9

### iv. Tactics Used

The use of strong-arm tactics and deception is generally associated with formal arrests rather than an informal encounter with law enforcement officers and is therefore considered an indicator of whether custody exists. *Griffin*, 922 F.2d at 1351. The absence of such methods does not necessarily mean that custody does not exist, but "the absence of such tactics is a factor which can assist [the Court] in reaching an objective conclusion that the suspect could not have associated the questioning with a formal arrest." *Id.* (citing *United States v. Jones*, 630 F.2d 613, 616 (8th Cir. 1980)).

In this case, the officers appear not to have used any tactics at all, let alone strong arm tactics. The ICE officers arrived at the Treasurer's Office at approximately 9:00 AM and formally arrested defendant at approximately 9:15 AM. After locating defendant, approaching him, initiating contact, requesting that defendant accompany the officers, and proceeding to the conference room, questioning of defendant only took a few minutes. Officer Walker testified that he asked only three questions. Officer Walker asked if the ID card belonged to defendant, whether defendant was from Guatemala, and whether defendant had permission to be in the United States. In such a limited amount of time with such a narrow line of inquiry, it simply cannot be said that officers used deception or strong-arm tactics. Thus, the fourth factor of the *Griffin* analysis weighs against a finding that defendant was in custody at the time of questioning.

### v. Domination of Interview

The question of whether the questioning of a suspect is police dominated is informed by multiple factors. The place of the questioning, the length of the questioning, the number of officers present, and whether the officers "dictate the course of conduct followed by the [suspect]" are all considerations to be accounted for. *Griffin*, 922 F.2d at 1352 (quoting *Jones*, 630 F.2d at 616). Where the atmosphere is found to be dominated by police such that a reasonable person would feel in custody, the Eighth Circuit has generally found that custody exists. (*See id.*)

10

In this case, no evidence has been presented to demonstrate an overbearing presence by the ICE officers. There were only two officers present at the questioning and they gave no orders to defendant regarding his personal behavior. *See United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (finding no police domination where nine officers were present during questioning). The officers bore no insignia of their office, wore plain clothes, and carried their weapons concealed. (*Id.*) (finding no custody where police did not display threatening posture, display weapons, or make physical show of force during questioning). Defendant may not have even been aware that the officers were law enforcement officers. Thus, the fifth factor of the *Griffin* analysis weighs against a finding that defendant was in custody at the time of questioning.

### *vi.   Defendant Arrested at Termination of Questioning*

The Eight Circuit has held that a suspect's arrest at the conclusion of questioning constitutes "objective evidence which tends to support the reasonableness of [the suspect's] subjective belief that [suspect] was in custody. . .." *Griffin*, 922 F.2d at 1356. As with the other factors, this factor is not determinative, but must be considered among the totality of the circumstances. *Czichray*, 378 F.3d at 826. This Court has previously found custody to exist in where a suspect was not arrested upon termination of the questioning. *U.S. v. Jarquin-Espinoza*, No. CR14-0121, 2015 WL 134338, at *9 (N.D. Iowa Jan. 9, 2015).[3] Conversely, this Courts has found that custody did not exist where a suspect was arrested following questioning. *United States v. Greathouse*, No.CR10-0048, 2010 WL 2756754, at *6-7 (N.D. Iowa Jul. 12, 2010).[4]

---

[3] This was a Report and Recommendation by the Honorable Jon Stuart Scoles, United States Magistrate Judge. Although the parties filed objections to the Report and Recommendation, the district court judge did not rule on the objections because the defendant then pled guilty to a criminal information.

[4] This was also a Report and Recommendation by Judge Scoles. The defendant did not file any objections and pled guilty soon afterwards.

11

In this case, defendant was formally arrested following questioning by ICE officers. Thus, the sixth factor of the *Griffin* analysis weighs in favor of a finding that defendant was in custody at the time of questioning.

### vii. Summary

As noted, the *Griffin* factors are not exhaustive and the Court is not to apply them numerically or "ritualistically." *Czichray*, 378 F.3d at 827. Ultimately, the test of whether a defendant is in custody is whether "a reasonable person in [the suspect's] position would not have felt free to terminate the interrogation and leave." *Cowan*, 674 F.3d at 957. Given these factors, and in light of the totality of the circumstances, I find that defendant was not in custody while being question by the ICE officers in the Treasurer's Office. The ICE officers merely asked defendant to come with them to the conference room, and he voluntarily did so. They used a calm tone of voice, never touched him, and there were only two officers dressed in plain clothes. Although most people will comply with a law enforcement officer's request, that fact does not convert a consensual encounter to custody. *INS v. Delgado*, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). The casual interaction between these officers and defendant in a public place does not have the appearance of custody that a reasonable person would believe they were not free to leave or decline the officer's request.

In order for police questioning to require that a suspect be informed of his or her rights, the questioning must be an "interrogation" and it must be "custodial." *Miranda*, 384 U.S. at 444. If the questioning occurs while the suspect is not in custody, no warnings required by *Miranda* are necessary, regardless of whether the questioning amounts to an interrogation or not. In this case, given that defendant was not in custody at the time of questioning, the ICE officers were under no obligation to inform defendant of his rights. It therefore makes no difference, for the purposes of the instant motion, whether the questioning amounted to an interrogation. Accordingly, I respectfully

12

recommend that the Court **deny** defendant's motion to suppress the statements defendant made at the Treasurer's Office**.**

### B. *Whether Miranda Was Required for Administrative Questioning*

Defendant argues that Officers were required to advise defendant of his constitutional rights before questioning him at the ICE office and their failure to do so requires suppression of any statements he made there. The government concedes, as it must, that defendant was certainly in custody when taken to the ICE office, but asserts that the officers were not required to provide defendant with *Miranda* warnings because Officer Callison only processed defendant administratively regarding immigration violations and asked questions related only to that procedure and routine booking. Defendant argues that *Miranda* warnings were required because the officer had reason to believe that defendant may provide answers that could be used in the prosecution of a criminal case. Again, defendant does not specifically identify what statements he made that he claims were incriminating or that the government used to bring charges against him.

Questions intended to elicit "routine biographical data [are] exempted from *Miranda's* coverage." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996). *See also United States v. Ochoa-Gonzales*, 598 F.3d 1033, 1038 (8th Cir. 2010) ("In particular, asking a routine booking question is not interrogation under *Miranda*."). "Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny." *United States v. McLaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985). Here, the grand jury has charged defendant with two counts of immigration-related offenses. Count One charges defendant with Unlawful Use of Identification Document in violation of 18 U.S.C. § 1546(a). (Doc. 2). Count Two charges defendant with Misuse of a Social Security Number in violation of 42 U.S.C. § 408(a)(7)(B). (*Id.*). The testimony at the hearing established that these

13

charges relate to defendant's use of a social security number and documents to gain employment.

Officer Callison testified that in administratively processing defendant, Officer Callison took the handcuffs off defendant, took defendant's fingerprints and photograph, and then asked defendant questions soliciting biographical information. Officer Callison asked defendant about health issues, whether he had dependent children that may need cared for, family background, city and country of birth, parents' name, and such similar background information. Officer Callison also asked defendant if he had reason to be scared to return to Guatemala, which is relevant for purposes of an asylum request. Officer Callison also asked defendant if he had any pending applications for citizenship or legal status to make sure that defendant's presence in the United States really did violate immigration laws. Officer Callison testified that he did not question defendant about the social security number, where he got it, or anything else to do with the social security number.[5] There was no indication that Officer Callison asked defendant anything about his employment either.

Although Officer Callison may have been aware of the theoretical possibility that anything a defendant says could be used against him or her in relation to a criminal investigation, Officer Callison did not ask questions designed to elicit incriminating information from this defendant. Nor is there any evidence that Officer Callison knew the questions he was asking would elicit incriminating information, especially regarding the substantive charges now pending against defendant. Rather, all of the questions Officer Callison asked defendant were properly part of an administrative booking process in relation to immigration issues. Under the facts of this case, therefore, Officer Callison was not required to advise defendant of his constitutional rights. Therefore, I respectfully

---

[5] Defense counsel's belief that Officer Callison did ask about the social security card, as reflected in defendant's brief, is understandable because it became apparent during cross examination of Officer Callison that Investigator Nesbaum had stated as much in Investigator Nesbaum's report. Officer Callison testified that Investigator Nesbaum's report was inaccurate in that respect and there was no evidence to the contrary.

14

recommend that the Court **deny** defendant's motion to suppress statements defendant made at the ICE office.

### C.     *Whether the Inevitable Discovery Exception Applies*

The government argues, alternatively, that even if officers violated defendant's constitutional rights, it would have inevitably discovered the information about defendant's unlawful use of the social security number and card in gaining employment. (Doc. 12-1, at 10-11).  Defendant did not address this issue in his brief or during argument.

The exclusionary rule does not apply if the government learned the same incriminating information from a source independent of the allegedly unconstitutional source.  *See Segura v. United States*, 468 U.S. 796, 805 (1984) ("In short, it is clear from our prior holdings that the exclusionary rule has no application where the Government learned of the evidence from an independent source.") (internal quotation marks, alteration, and citations omitted).  *See also Nix v. Williams*, 467 U.S. 431, 444 (1984) (holding that where information is discovered after police violate the Fourth Amendment, the evidence should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.").  The inevitable discovery exception to the exclusionary rule applies only if the government can establish (1) a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.  *United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008) (citing *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir.1998)).  *See also United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (setting forth the two-prong test).  The Supreme Court has emphasized that "inevitable discovery

15

of illegally seized evidence must be shown to have been more likely than not." *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

During the hearing, the clerk testified that she contacted IDOT Investigator Nesbaum about the discrepancy she was finding in defendant's documents. When Investigator Nesbaum ran the social security number defendant used to purchase a car, Investigator Nesbaum found that it did not match his name. Investigator Nesbaum then contacted ICE and the Cedar Rapids Police Department. Officers Walker and Callison testified that Investigator Nesbaum then actively conducted his own investigation and provided them with information about defendant. Although the government did not fully develop this line of questioning during the hearing, presumably the ICE officers used Investigator Nesbaum's information to identify defendant's place of employment, retrieve copies of the paperwork defendant used to apply for employment, and through that investigation discovered defendant's use of a social security number and card that did not belong to him.

I find the government has met the inevitable discovery exception requirements in this case. Investigator Nesbaum had initiated an independent investigation into defendant's use of a social security number that did not belong to him before the ICE officers had any contact with defendant and irrespective of any statements defendant made at the Treasurer's Office or ICE office. Investigator Nesbaum is the one who contacted the ICE officers in the first instance. He then completed a report that he provided to the ICE officers. Although the government did not flesh out all of the facts at the hearing, it is a logical and reasonable inference that the ICE officers used the information developed by Investigator Nesbaum to investigate defendant's employment. It appears to me that it is more likely than not that the ICE officers would have inevitably discovered

defendant's unlawful use of the social security number and document even if he had left the Linn County office and had never encountered the ICE officers.[6]

Therefore, I respectfully recommend the Court deny defendant's motion to suppress on the alternative ground that the government would have inevitably discovered the incriminating information even if the Court finds the government violated defendant's constitutional rights.

## IV.  CONCLUSION

For the reasons set forth above, I respectfully recommend the Court **deny** Defendant's Motion to Suppress. (Doc. 10).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 1st day of August, 2018.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa

---

[6] Incidentally, although defendant also told the clerk where he worked, there was no evidence that the government's investigation into the current charges involved questioning the clerk about statements defendant made to her, so I do not believe the Court can find that defendant's statement to the clerk formed an independent source of investigation the government was then actively pursuing.